**IMG-041**                                                     **NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-2557
_____

ABDALLAH ISSAKH,
                                              Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A096-169-731)
Immigration Judge:  Honorable Mirlande Tadal

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
February 16, 2011
Before:  AMBRO, GREENAWAY, JR. AND GREENBERG, Circuit Judges

(Opinion filed May 10, 2011  )
_____

OPINION
_____

PER CURIAM

    Petitioner Abdallah Issakh, a native and citizen of Chad, petitions for review of a

final order of removal from the Board of Immigration Appeals ("BIA"), dismissing his

1

appeal from the denial of his applications for asylum, withholding of removal, and

protection under the Convention Against Torture ("CAT"). For the reasons that follow,

we will grant the petition for review, vacate the final order of removal, and remand to the

BIA for further proceedings.

I.

Issakh first entered the United States on July 23, 2002, on a business visa. On

February 10, 2003, he filed an application for asylum claiming that the Chadian

government persecuted him on the basis of his race and membership in a particular social

group, the Guran tribe. That application was denied.[1] Issakh returned to Chad in 2007.

He re-entered the United States on July 10, 2008, and was immediately placed in removal

proceedings. Issakh conceded removability and applied for asylum, withholding of

removal, and protection under CAT on the basis that while in Chad he was persecuted on

account of an imputed political opinion or his ethnicity.

At his merits hearing, Issakh testified that he had returned to Chad in 2007

because he had lost his authorization to work in the United States, and he had received

news that his family was in shambles and his home village had been destroyed as a result

of continuing civil strife in the country. He returned to Chad via Sudan, which he entered

---

[1] Issakh's appeal to the BIA was dismissed on March 10, 2005. He subsequently filed a motion to reconsider that was denied on June 27, 2005. The BIA denied his motion to reopen on November 18, 2005. The United States Court of Appeals for the Seventh Circuit denied his petition for review challenging the denial of his motion to reopen on January 11, 2007. See Issakh v. Gonzales, No. 05-4636, 2007

2

with a fraudulent Sudanese passport.  After spending approximately three weeks in a border refugee camp in Sudan, Issakh crossed into Chad to exchange his United States currency.  While in the exchange shop, he was approached by a government security officer who asked Issakh for his identity card.  Issakh told the officer that he had come from Libya.  Issakh testified that the agent became suspicious of his lack of official documents and made a phone call.  Within minutes, additional officers arrived and arrested Issakh.  They detained him in a local jail, beat him, and demanded to know who he was and who he was related to.  AR 168.  Issakh gave them the address of a man that he had stayed with at the refugee camp, Mohamed, and Mohamed was found and brought in the next morning.  Issakh testified that Mohamed told them everything he knew about Issakh's situation, including that he had just returned from the United States.  AR 169.  The next day, Issakh was transported to another jail that was several hours away by car.  He was detained there for ninety days, during which time he was accused of being a rebel against the governing regime, and was severely beaten.  Issakh testified that the guards told him they knew he was a rebel because of the fact that he had money, and because he lied about his identity.  The officers accused his whole family of being rebels and demanded that he give them the name of a relative in Chad.  AR 170.

Issakh maintained his story that he was from Libya, but disclosed the name of an acquaintance with whom he had commercial transactions in the 1990s.  AR 171.  The

U.S. App. LEXIS 1025, at *13 (7th Cir. Jan. 11, 2007).

police found the man and brought him to the prison. The man confirmed that Issakh was a business acquaintance whom he had known for a long time. After this, Issakh testified, his situation grew much worse. AR 172. He was taken from his cell to a room and interrogated by an alleged "attorney" who asked him again if he was a rebel and exhorted him to "tell the truth." AR 173. When Issakh maintained his story about being from Libya, he was struck on the back with a rifle butt, causing him to hit his head on the table. He was also tied up by the hands and feet, hung upside down from the ceiling, and beaten severely. The officers hit him with fists and boots, lashed him with a whip, and threatened that they would kill him unless he told the truth. AR 174. When Issakh became totally exhausted from the beating, they put him back in his cell. This was repeated again the next day, and the officers struck Issakh on the bottoms of his feet until his feet were swollen and raw. AR 174. Issakh testified that he was completely incapacitated after this beating, and could not walk or even stand. AR 175. He was only released when a rebel force took over the city and freed all prisoners in or around February 2008. AR 176. Issakh remained in Chad for the next five months, moving from house to house to avoid detection. AR 176-77. He was able to obtain a government issued national identity card. He then purchased a fraudulent passport to leave Chad and returned to the United States.

At the merits hearing, the IJ considered Issakh's testimony, as well as the State Department Reports relevant to Chad. The IJ did not make an adverse credibility finding

4

against Issakh and acknowledged that his testimony appeared to be plausible in light of the background material detailing Chad's ongoing problems with civil strife and rebel groups, and its poor human rights record. AR 111. However, the IJ ultimately concluded that Issakh failed to meet his burden of demonstrating eligibility for asylum. With respect to the arrest and detention, the IJ found that Issakh was targeted as a consequence of his intentional misrepresentation of his identity, and not on account of a protected ground. In support of the conclusion that the authorities did not appear interested in harming Issakh on account of his ethnicity or actual or imputed political opinion, the IJ cited the fact that Issakh remained in Chad for five months following his detention unharmed, and was issued a national identification card with his true identity by a government office. The IJ further held that this was not a mixed motive case. In addition, the IJ faulted Issakh for failing to submit any medical documentation to evidence that he was mistreated as he claimed.

The BIA dismissed Issakh's appeal for the reasons stated by the IJ. In doing so, the BIA noted that the IJ did not find that Issakh was not credible, rather than he had failed to satisfy his burden of proof. The BIA also noted Issakh's lack of corroborative evidence, and the fact that Issakh failed to seek medical attention in either Chad or in the United States. [2]

---

[2] The BIA also determined that the IJ had not erred in refusing to allow Issakh to present evidence about the persecution he suffered prior to 2006 that formed the basis of his first asylum application. Issakh has not raised that issue in this appeal.

The instant petition for review followed.

## II.

We have jurisdiction under 8 U.S.C. § 1252(a)(1) to review final orders of removal issued by the BIA. Hashmi v. Att'y Gen., 531 F.3d 256, 259 (3d Cir. 2008). Where, as here, the Board adopts and affirms the decision of the IJ, as well as provides its own reasoning for its decision, "[we] review[] both the decisions of the IJ and the BIA." Id. We review the BIA's legal conclusions de novo, subject to established principles of deference. See Kaplun v. Att'y Gen., 602 F.3d 260, 265 (3d Cir. 2010). "We review an IJ's factual findings, including his or her determination of whether an alien was subject to persecution or has a well-founded fear of future persecution, under the substantial evidence standard." Toure v. Att'y Gen., 443 F.3d 310, 316 (3d Cir. 2006); see also Wong v. Att'y Gen., 539 F.3d 225, 230 (3d Cir. 2008). Although substantial evidence review is deferential, such that we may reverse only if a reasonable adjudicator would be compelled to conclude to the contrary, see 8 U.S.C. § 1252(b)(4)(B), that deference is conditioned on support in the record. An IJ must support her factual determinations with "specific, cogent" reasons such that her conclusions "flow in a reasoned way from the evidence of record and are [not] arbitrary and conjectural in nature." Toure, 443 F.3d at 316 (quoting Dia v. Ashcroft, 353 F.3d 228, 250 (3d Cir. 2003) (en banc)). Deference is not due where findings and conclusions are based on inferences or presumptions that are not supported by "reasonable, substantial and probative evidence on the record

6

considered as a whole." Mulanga v. Ashcroft, 349 F.3d 123, 131 (3d Cir. 20003); see also Abdille v. Ashcroft, 242 F.3d 477, 483-84 (3d Cir. 2001).

III.

In order to be eligible for asylum, Issakh must demonstrate that he is unable or unwilling to return to Chad "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); 8 U.S.C. § 1158. Although not entirely clear from the IJ's oral opinion and the BIA's order, we read these decisions as finding that Issakh failed to demonstrate past persecution. AR 3, 114. To the extent they made such findings, we are compelled to reverse. We have defined persecution as "extreme conduct" that includes "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." Fatin v. INS, 12 F.3d 1233, 1240 & n.10 (3d Cir. 1993). In determining whether harm rises to the level of persecution, the harm must be more than "mere harassment." See Ivanishvili v. U.S. Dep't of Justice, 433 F.3d 332, 341 (2d Cir. 2006). However, persecution need not rise to the level of torture to be a ground for asylum. Kibinda v. Att'y Gen., 477 F.3d 113, 119 (3d Cir. 2007).

Issakh was held for ninety days—a substantial period of time—and there is no indication that he would have been released at all if it had not been for the rebel takeover of the prison. Over that time, he was beaten on multiple occasions, once to the point where he could no longer stand and could only crawl. He was also bound and strung

7

upside down, flogged with a whip, and his life was threatened. He bears permanent scars from the ordeal. This treatment far exceeds mere harassment and is sufficiently severe to rise to the level of persecution. See Toure, 443 F.3d at 318-19; see also Baba v. Holder, 569 F.3d 79, 85 (2d Cir. 2009) (finding persecution where individual was imprisoned for three days, then a week, beaten daily and threatened with death if he did not cease his political activity).

Moreover, we believe the IJ's findings and conclusions regarding corroboration are not supported by substantial evidence in the record. We note at the outset that the IJ did not make a credibility finding in this case, meaning that Issakh's testimony is entitled to a "rebuttable presumption of credibility on appeal." 8 U.S.C. § 1158(b)(1)(B)(iii); Camara v. Att'y Gen., 580 F.3d 196, 201 (3d Cir. 2009). An alien's testimony by itself, if credible, can satisfy the burden of establishing a claim for relief by objective evidence. See 8 C.F.R. § 1208.13(a); Kibinda, F.3d 113 at 120 n.5. Because Issakh does bear the burden of proof, however, he is required to submit corroborating evidence "when it is reasonable to expect corroborating evidence and there is no satisfactory explanation for its absence." Sandie v. Att'y Gen., 562 F.3d 246, 252 (3d. Cir. 2009). "'[N]o court shall reverse a determination made by a trier of fact with respect to availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.'" Id. (quoting 8 U.S.C. § 1252(b)(4)). As the IJ noted, however, unreasonable demands are not placed on

8

an asylum applicant to present evidence to corroborate particular experiences.  See In re

S-M-J, 21 I. & N. Dec. 722, 725 (BIA 1997).

In this case Issakh testified that his beatings rendered him temporarily unable to stand or walk, that his feet were swollen and some of the skin was stripped, and that he still had a scar on his head and lash marks on his body.  Additionally, he submitted a letter from the acquaintance who identified him, stating that "I noticed signs of torture on him and he appeared to be very week [sic]."  AR 267.  Issakh's attempts to display the scarring on his feet to the IJ during his merits hearing were harshly rebuffed.  AR 175.  Thus, given that the IJ did not find that Issakh was not credible, the IJ must have rested her conclusion that Issakh failed to provide persuasive evidence of his mistreatment on the fact that Issakh did not seek medical attention.  But that is inconsistent with our decision in Issiaka v. Attorney General, where we rejected an IJ's adverse credibility finding that was in part based on the respondent's failure to testify that he had received medical care.  569 F.3d 135, 140-41 (3d Cir. 2009) (stating that "even 'if best practices' would require that Issiaka receive stitches, there is nothing here to suggest that he had access to that kind of medical care.  He was, after all, in rural West Africa, and it appears that the IJ never even considered that circumstance or context before drawing a negative inference from Issiaka's failure to say that he received stitches.").  As in Issiaka, the IJ and BIA do not appear to have considered Issakh's particular circumstances or context before drawing a negative inference from his failure to seek medical attention.  Issakh

testified that he was essentially living on the lam for the few months following his release until he could secure safe passage to the United Sates, and the State Department Country Report for Chad paints a picture of a country disrupted by civil strife, where it appears unlikely that medical intervention is readily available. Indeed there was no evidence submitted that Issakh was privy to medical care that he did not avail himself of. Nor was there any evidence submitted that would tend to suggest that Issakh was not mistreated in prison as he attests. Accordingly, this is a situation in which a reasonable trier of fact would conclude that corroborating medical documentation is unavailable.

We next consider Issakh's claim that the IJ incorrectly determined that the record did not establish that he was persecuted on account of a protected ground, specifically, because of his political opinion or an opinion imputed to him based on his membership in the Guran tribe. A "key task for any asylum applicant is to show a sufficient 'nexus' between persecution and one of the listed protected grounds." Ndayshimiye v. Att'y Gen., 557 F.3d 124, 129 (3d Cir. 2009). An asylum applicant, however, need not demonstrate that the protected ground was the exclusive motivation behind the alleged persecution. He may prevail if he can provide some evidence that a protected characteristic was or will be at least "one central reason" for the alleged persecution. Id.; see also INA § 208(b)(1)(B)(i); 8 U.S.C. § 1158(b)(1)(B)(i). A persecutor's motives may be mixed if part of the motivation is covered under the statute. See Chang v. INS, 119 F.3d 1055, 1065 (3d Cir. 1997). The statute does not require that the motive alleging a

10

protected basis occupy a higher rank than any other unprotected motive. Ndayshimiye, 557 F.3d at 130. However, "asylum may not be granted if a protected ground is only an incidental, tangential, or superficial reason for persecution of an asylum applicant." Id.

In this case, the IJ found that Issakh was persecuted solely because he made misrepresentations to the authorities, and summarily rejected the claim that this was a mixed-motive case.[3] We find that conclusion to be unsupported by the record. Although the record does support the IJ's finding that Issakh was initially detained because he lacked identity documents, there is substantial evidence that over the course of his detention, the officials learned information about Issakh's identity that gave them reason to believe he was a ethnic Guran and/or a rebel, or to impute that status or political opinion to him. The record reflects both that the police repeatedly accused Issakh of being a rebel, and that Issakh's treatment at the hands of the police significantly worsened once they verified his true identity. Specifically, it was only after Issakh's former acquaintance told the police that he "had known [Issakh] for a long period of time and that was a long, long, time ago," AR 172, that Issakh received his most severe beatings. This testimony is inconsistent with the IJ's conclusion that, once the authorities were aware of Issakh's identity, they did not appear interested in harming him on account of his ethnicity or actual or imputed political opinion. AR 16, 78.

---

[3] We also note that although the IJ's finding that there was no mixed motive was challenged by Issakh on direct appeal, the BIA failed to address that argument in its opinion.

11

In addition, the IJ failed to consider Issakh's testimony that two different individuals disclosed information to the authorities regarding Issakh's true identity. Indeed, the IJ appeared to misunderstand Issakh's testimony on this issue. The IJ recalled that Issakh stated that the officials insisted that he "disclose the truth and that the respondent was a rebel from Libya," AR 67, when in fact Issakh's testimony is clear that the officers continued to harass him because they either knew or suspected that he was not Libyan at all. AR 168, 170-173. The fact that Issakh was able to obtain an identity card and remain unharmed in Chad for five months while in hiding is not substantial evidence that Issakh's ordeal was not motivated, at least in part, on account of a protected ground. Although it may have been reasonable to conclude from the record that Issakh's initial detention stemmed from his lack of identity documents, the IJ did not meaningfully consider Issakh's argument that, after verifying Issakh's identity, the officers were operating with mixed motives. Given the evidence in the record and the lack of analysis of this claim, we are compelled to vacate the IJ's summary conclusion that there was no mixed motive in this case.[4]

IV.

---

[4] We do not address Issakh's claim under the CAT because he did not administratively exhaust this claim on appeal to the BIA, nor does he raise it in his petition for review.

Accordingly, we will grant the petition for review. The final order of removal will be vacated and this matter will be remanded to the BIA for further proceedings consistent with this opinion.